[Civil No. 3634. Filed January 17, 1938.]

[75 Pac. (2d) 45.]

SHELL OIL COMPANY, INCORPORATED, a Corporation, Appellant, v. ROBERT H. BRAZEE, Appellee.

Messrs. Fennemore, Craig, Allen & Bledsoe, for Appellant.

Messrs. Struckmeyer & Flynn, for Appellee.

LOCKWOOD, J.—This is an appeal by Shell Oil Company, Incorporated, a corporation, hereinafter called defendant, from a judgment in favor of Robert H. Brazee, hereinafter called plaintiff. The record discloses the following situation: Defendant is a corporation engaged in the wholesale production and distribution of petroleum products. In the spring of 1934

it entered into a written contract with plaintiff covering a certain service station operated by the latter, which contained the following provisions:

"2. . . . Should the Company be delayed or prevented in the performance of any of its covenants hereunder by act of God, accident, fire, earthquake, insurrection, *Governmental action*, strike, total or partial failure of transportation facilities or supplies, or by any cause whatsoever beyond its reasonable control, whether of a similar or dissimilar class, the performance of such covenant, may be suspended while the Company is so prevented or delayed without liability on the part of the Company on account thereof, but the agent in such event shall be entitled to obtain from other sources such gasoline as may be required for sale through said pumps during such period, no such gasoline to be sold, however, except in containers or through pumps conspicuously marked to indicate such gasoline to be of other manufacture than the Company's." (Italics ours.)

"3. . . . Except as hereinafter provided, gasoline consigned by the Company to the Agent shall be sold by the Agent only at retail prices authorized by the Company from time to time and the Agent shall not advertise or offer any gasoline consignment by the Company to the Agent for sale at any prices except such as are authorized by the Company. The Agent shall not offer, pay or allow any rebates, credits, discounts, premiums, or resort to any other device whereby the net selling price of gasoline consigned by the Company to the Agent shall be lower than that authorized by the Company."

At the same time the parties entered into an oral contract identical in its terms, but covering a second station. Both of these contracts were made after the passage of the National Recovery Act (48 Stat. 195), and the promulgation of the Code of Fair Competition for the Petroleum Industry, and were obviously made with the contemplation that they would be subject to such act and Code. The Code provided as follows:

"All retailers and others who sell consumers shall conspicuously post at the place from which delivery is made, and at places there readily accessible during business hours to the public one price at which each brand, grade or quality of naphtha, gasoline, motor fuel, lubricating oil, grease, kerosene and heating oil are sold. All retailers and others who sell consumers, unless prevented therefrom by applicable law, shall separately post in the same manner all tax they are required to pay or collect because of the sale of naphtha, gasoline, motor fuel, lubricating oil, greases, kerosene and heating oil. All prices posted shall remain in effect for at least twenty-four (24) hours after they are posted."

Plaintiff had for a long time, both before and after the contracts between himself and defendant, persistently and openly violated the provisions of the Code above quoted. His conduct was investigated by the Regional Planning and Co-ordination Committee having charge of the enforcement of the Code, and on the 22d of May, 1934, defendant was notified that, if it supplied petroleum products to any violator of the Code, it would be considered to be *particeps criminis* and subject to prosecution. Defendant notified plaintiff of the situation and that it would be compelled to cease delivery to him of gasoline in accordance with its contract, to which he replied that he was running his own business and would not change his conduct. On May 25th defendant notified plaintiff that it would not deliver him any more gasoline so long as he continued to violate the Code, but, as soon as he ceased such violation, it would gladly deliver him all the gasoline he wanted; that it still considered the contract in force and would live up to its obligation thereunder whenever plaintiff ceased his violations of the Code as aforesaid.

Plaintiff on May 29th filed his complaint, with two causes of action, setting up the contracts, the failure

of defendant to deliver him gasoline, his inability to obtain it from any other wholesaler, and that he was damaged to the extent of $2,700, $1,200 at one of his stations, and $1,500 at the other. The prayer of the complaint was that the defendant be restrained from failing to deliver gasoline to plaintiff, in accordance with its contract, and for the damage above alleged. A temporary injunction was granted, as requested by plaintiff, and defendant answered, admitting the contract, but alleging that plaintiff had violated the provisions of the Petroleum Code, and that defendant had been informed by the proper authorities that, if it continued to supply plaintiff with gasoline, it would be considered as a violator of such Code; that the contract provided that, should it be prevented from performing it by reason of governmental action, delivery of gasoline might be suspended, and it should not be liable on account thereof, and that it was at all times willing to supply gasoline under the contract if, as, and when plaintiff would cease violating the Code, and that it did resume such supply upon the 8th day of June, and had continued it ever since. Defendant also filed a counterclaim, alleging that at the date of the institution of the action plaintiff was indebted to it in the sum of $1,821.69 for petroleum products furnished him, and sought to recover that amount. To this counterclaim, plaintiff answered with a general denial and an allegation of payment on the account of $1,033.19.

The case went to trial on its merits on November 7, 1934. During such trial it was admitted by plaintiff that he had violated the provisions of the Petroleum Code before defendant stopped delivering gasoline, and that he had been notified by defendant that his continued violation of the Code would compel it to cease its deliveries. Defendant, on the other hand, admitted that it did not, upon such violations of the

Code, declare its contract at an end, but on the contrary, insisted that the contract was still in force and effect, and that it elected to keep it alive and at the same time to decline to deliver gasoline to the plaintiff until he complied with the Code. The trial court held, in substance, that the only rights of defendant, in case plaintiff violated the Code, were either to keep its contract alive and continue to deliver gasoline, or to terminate the contract entirely, and that it could not, as long as it kept the contract alive, discontinue the service to the plaintiff which it had agreed to perform under the terms of the contract, notwithstanding his violation of the Code, without being liable for any damages which he might sustain as a result thereof. This was, in effect, a ruling that the defendant could not take advantage of plaintiff's violation of the National Recovery Act by continuing the contract in force, and at the same time refusing to deliver gasoline to plaintiff until he complied with the act. The case finally went to the jury under instructions which, on the admitted facts of the case, necessarily required them to return a verdict for some amount in favor of plaintiff on his complaint.

The evidence in regard to defendant's counterclaim showed, in substance, that plaintiff claimed he had an agreement whereby the defendant was to allow him a credit of one cent per gallon on all gasoline sold him, to be deducted from the billed price. This agreement was not denied by defendant, but it was the contention of the latter that the allowance was terminable at any time by the defendant, while plaintiff claimed it was to continue during the lifetime of the contracts. If defendant's contention as to the allowance were correct, no credit should have been allowed to plaintiff on the counterclaim. If, on the other hand, plaintiff's theory of the credit were correct, the amount of $1,033.19 was properly deducted from the counterclaim.

During the course of the trial, plaintiff asked leave to make a trial amendment of his complaint, which had originally only asked for damages to the date of the filing of the complaint, so as to include damages for loss of profits covering the entire period of the contract. This amendment was allowed, over the objection of the defendant, and was in the following language:

"VIII (1st Cause of Action)

"That by reason of the breach of said agreement as above alleged, and as a direct result thereof, the plaintiff has been deprived of large profit in the conduct of said business from the date of said breach to the commencement of this action, and plaintiff will in the future and during the term of said contract continue to be deprived of large profits in the conduct of said business, to his damage in the sum of $1200.00."

"VII (2nd Cause of Action)

"That by reason of a breach of said agreement as above alleged, and as a direct result thereof, the plaintiff has been deprived of large profit in the conduct of said business from the date of said breach to the commencement of this action, and plaintiff will in the future and during the term of said contract continue to be deprived of large profits in the conduct of said business, to his damage in the sum of $1500.00."

After evidence had been offered as to the amount of damages, the case was submitted to the jury, which returned a verdict in favor of plaintiff on the first cause of action for $800, and on the second for $1,445, and in favor of defendant on the counterclaim for $788.50, which was in effect a finding that plaintiff's theory of the credit allowance of one cent per gallon was the correct one. Judgment was duly rendered, and, after the usual motion for new trial had been overruled, this appeal was taken.

It is apparent from the foregoing statement of facts that the substance of the defense to plaintiff's complaint was that defendant had the right, because of

plaintiff's violation of the Code and the statement by the Code authorities that if it continued to supply plaintiff with gasoline it would be prosecuted criminally, to continue the contracts in force and still refuse to supply plaintiff with gasoline, unless and until he did comply with the Code, without being liable to him for any damages caused by its action. There was no contention by defendant in the trial court that its action in refusing to supply gasoline could be justified for any other reason than a refusal by plaintiff to comply with the conditions of the Petroleum Code. The trial court, in substance, held that the provisions of the Code which plaintiff had violated did not and could not apply to wholesalers who merely sold petroleum products to the plaintiff, and that defendant could not, on account of such violation, have been prevented from or punished for continuing to supply plaintiff with gasoline. If such were the case, it held that, since defendant had elected to keep the contract in effect, it was bound to deliver the gasoline, regardless of plaintiff's disobedience of the Code. Whether the court or the defendant was correct in its theory of the law upon this subject is immaterial in the present appeal. The Supreme Court of the United States, in the case of *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 55 Sup. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947, on May 27, 1935, laid down a rule which, in effect, declared void every code adopt⌐d under the authority of the National Recovery Act. This necessarily ·included the Petroleum Code. This decision was after the taking of the appeal in the present case, but before the filing of defendant's opening brief. Evidently it came to the conclusion that, in view of the decision just cited, it could not justify its refusal to deliver gasoline to the plaintiff on account of the failure of the latter to comply with the Petroleum Code, for nowhere in the assignments of error do we

find any suggestion that the trial court erred in its rulings on this point. On the contrary, all the assignments of error, except those as to the measure of damages, are based on the theory that the plaintiff had violated the terms of his contract with the defendant requiring him to sell gasoline at prices authorized by defendant, and that the latter was therefore authorized to refuse to deliver gasoline until and unless plaintiff complied with such conditions. It may be that had defendant at the trial of the case in the lower court based its refusal to deliver gasoline on a violation by the plaintiff of this provision of the contract, that its theory of its rights under the law would be correct, or it may be that, notwithstanding the decision of the Supreme Court in the Schechter case, *supra,* and its far-reaching effect, it might on appeal have successfully contended that, since it had acted in good faith under the belief the act was valid, it could not be penalized for the consequence of its action. Unfortunately for it, in the trial court it relied entirely upon a violation of the Petroleum Code, without any reference to the provision of the contract requiring plaintiff to sell at prices fixed by defendant, while in this appeal it has made no assignment of error based on rights and duties arising out of such Code, and has apparently changed its theory of the case as presented in the lower court, and for the first time contends that the provisions of the contract requiring plaintiff to advertise and sell its gasoline on the terms fixed by defendant were violated by plaintiff, and that the court, therefore, erred in holding that defendant had no right to continue the contract in force without delivering gasoline.

■■ It has long been the rule of this court that a case may not be tried on one theory of the law in the lower court and upon another theory on appeal to this court. *Tevis* v. *Ryan,* 13 Ariz. 120, 108 Pac. 461; *Packard Phoenix Motor Co.* v. *McRuer,* 41 Ariz. 450,

19 Pac. (2d) 332. We therefore cannot consider the question of whether defendant did present by its pleadings and proof a defense to plaintiff's action. This disposes of assignments of error 1, 2, 5, 6, 7, and 8, for, since defendant submitted its case to the trial jury on one theory of a defense, and is now attempting to present it to this court on another theory, it cannot complain either that the trial court erred in not submitting to the jury the theory of defense which it has abandoned on the appeal, or that it should have submitted a theory which was never presented to it.

■■ We come then to the only assignments of error affecting the verdict in favor of plaintiff on his first and second causes of action, which we may consider. These are summarized by defendant under the proposition of law that the measure of damages, assuming that plaintiff was entitled to any damages, would be limited to the difference between the net profit which he actually received at his service stations from the sale of gasoline only, and the net profit which he would have received from such sales, had not defendant discontinued deliveries of gasoline over the period from May 25th to June 8th. The original complaint confined its allegations to damages accruing up to the time of the filing of the complaint, May 29, 1934. The court, realizing the situation, announced that it would grant plaintiff leave to make a trial amendment which would permit him to offer evidence of loss of business up to the time of trial, in order to avoid a multiplicity of suits. Defendant objected to the allowance of the amendment, but the record shows this was not made on the ground of surprise, nor did it ask for further time to meet the new issues introduced by the amendment. Its objection was that under no circumstances could profits of the nature permitted by the amendment be a proper element of damages, on the ground they were too remote and

speculative. We think, if it is permissible under any circumstances to recover damages for the loss of future business occasioned by the cessation of delivery of gasoline from May 25th to June 8th, it was not error for the court to permit a trial amendment covering such damages, although, had defendant moved for a continuance on the ground it was taken by surprise and not prepared to meet the new issues, it probably would have been an abuse of discretion to refuse a reasonable continuance. This, however, was not asked. The question then is whether the plaintiff is confined to damages for the loss of sales of gasoline during the period he was without it, or whether he may also show general loss of business occasioned by such cessation of delivery, though at a time after delivery had been resumed. It appears from the evidence on behalf of plaintiff that the ordinary service station derives only a portion of its profits from the sale of gasoline, and that from 50 to 60 per cent. of such profits come from the sale of tires, accessories, lubricants, and services rendered, such as washing, oiling, and greasing of cars. It also appears from such evidence that the ordinary customer who desires these various services performed usually has them done at the station where he purchases gasoline, and that, if such station is unable to furnish gasoline to the prospective customer, the owner is very likely to lose not only the profit on the sale of gasoline, but also the profit naturally accruing on all of the other various services performed at the station, for the reason that the customer who is unable to obtain gasoline will, in many if not most cases, transfer all of his business to some other station. If such be the fact, and we cannot say that the jury was not justified in believing plaintiff's evidence on this point, it is plain that the loss occasioned by the wrongful act of the defendant in refusing to deliver gasoline in accordance

with its contract might have been far greater than the mere loss of the profit of the gasoline which he was unable to sell. It is true that in the very recent case of *Rio Grande Oil Co.* v. *Pankey,* 50 Ariz. 529, 73 Pac. (2d) 707, we based our decision that the damages were excessive solely on the loss of sale of gasoline, but in that case the damages asked for were for loss from that source and no other, and there was no evidence in regard to damages from any other reason than the loss of credit customers for gasoline. We are of the opinion that plaintiff was entitled to show any loss of profits to his business at any time during the life of the contracts, if such were reasonably attributable to defendant's failure to supply gasoline, and was not limited to damages for the loss of profit on gasoline alone during the period from May 25th to June 8th. There was evidence in the record sufficient to sustain the verdict as to the damages under plaintiff's first and second cause of action.

The only other question which we think it necessary to discuss is whether plaintiff, under the issues of the case, should have been permitted to show the alleged agreement for the one cent credit upon gasoline and to deduct such credit from the gross amount which it is admitted he owed defendant under the allegations of the counterclaim. It is perhaps true that on a plea of part payment, strictly speaking, plaintiff should only have been permitted to prove actual payment in cash. We think, however, that the error is one of form rather than of substance. There is no contention that defendant was misled by the pleading, or any claim that it did not know at all times that the payment which plaintiff expected to show consisted of a credit on gasoline. The real contention on this point was whether or not the admitted agreement for credit was terminable at the option of the defendant, or continued during the life of the contracts. This

question was submitted to the jury under proper instructions, and was resolved by it against defendant. We think it would be hypertechnical to send the case back on account of the variance between pleading the payment and the proof of credit, and that under article 6, section 22, of the Constitution, the error does not justify a reversal of the case.

We have considered all the assignments of error, but think it unnecessary to discuss them all at length.

For the reasons above set forth, the judgment of the trial court is affirmed.

McALISTER, C. J., and ROSS, J., concur.